UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States

     v.

Michael Bean

Criminal No. 18-cr-057-03-LM
Opinion No. 2019 DNH 027

**O R D E R**

Defendant Michael Bean is awaiting sentencing on one count
of conspiracy to distribute and possess with intent to
distribute 50 grams or more of methamphetamine in violation of
21 U.S.C. §§ 846 and 841(b)(1)(A)(viii). He moves this court to
issue an order declaring a categorical policy disagreement with
the "purity-driven" methamphetamine sentencing guidelines. The
government objects. The court heard oral argument on the motion
on January 14, 2019. For the following reasons, the court
grants Bean's motion.

**BACKGROUND**

This is a four-defendant methamphetamine conspiracy case.
Bean pleaded guilty to Count 1 of the multi-count second
superseding indictment (doc. no. 41) on November 21, 2018.
Count 1 charges him with conspiracy to distribute and possess
with intent to distribute 50 grams or more of methamphetamine in
violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii). Bean

stipulated in his plea agreement that the conduct underlying
this charge involved his receipt of parcels of methamphetamine
through the mail from Nevada, distribution of methamphetamine to
buyers in New Hampshire, and transfer of proceeds through the
mail or by wire transfer back to Nevada to purchase more drugs.
In the plea agreement, the parties agreed that the government
would recommend that Bean be sentenced at the bottom of the
applicable advisory sentencing guidelines range and that the
"quantity of actual Methamphetamine for which [Bean] is
accountable at sentencing is at least 500 grams but less than
1.5 kilograms." Doc. no. 79 at 6.

Bean asks this court to declare a categorical policy
disagreement with the guidelines applicable to methamphetamine
offenses, which treat quantities of actual methamphetamine and
"ice" more harshly than the same quantities of a mixture
containing a detectable amount of methamphetamine. Bean
requests that the court apply the guidelines for methamphetamine
mixtures to all methamphetamine offenses. Bean's sentencing is
scheduled for March 5, 2019.

## DISCUSSION

In United States v. Booker, 543 U.S. 220, 245 (2005), the
Supreme Court held that the United States Sentencing Guidelines
("guidelines") are "effectively advisory" and that they "serve

2

as one factor among several courts must consider in determining the appropriate sentence." Kimbrough v. United States, 552 U.S. 85, 90 (2007). Although advisory, the guidelines remain the "starting point and the initial benchmark" for sentencing. Gall v. United States, 552 U.S. 38, 49-50 (2007); see also United States v. Millan-Isaac, 749 F.3d 57, 68 (1st Cir. 2014) (holding district court's failure to calculate defendant's guidelines sentence range is "serious procedural error").

The guidelines cannot be the court's only consideration, however. Gall, 552 U.S. at 49. The sentencing court must also consider the sentencing factors in 18 U.S.C. § 3553(a), including the nature of the offense, the history and characteristics of the defendant, and the goals of deterrence and protection of the public to determine what sentence is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). The court must make an "individualized assessment based on the facts presented" about whether to vary upward or downward from the guidelines sentencing range. See Gall, 552 U.S. at 50. In doing so, the court may not presume that the guidelines range is reasonable. Id. at 49-50.

District courts are entitled to vary from the guidelines sentencing range not only on the basis of individualized determinations specific to each defendant, but also on the basis

of a categorical policy disagreement with the guidelines themselves. The Supreme Court held in Kimbrough that a district court could deviate on policy grounds from the 100:1 ratio for crack and powder cocaine in the guidelines. Kimbrough, 552 U.S. at 106-07, 110. The Court clarified this holding in Spears v. United States, 555 U.S. 261 (2009). In Spears, the Supreme Court stated that Kimbrough recognized "district courts' authority to vary from the crack cocaine Guidelines based on [a] policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." Spears, 555 U.S. at 264.

The First Circuit has interpreted Kimbrough as empowering a sentencing court to disagree with guidelines other than the crack cocaine guidelines that were at issue in that case. United States v. Stone, 575 F.3d 83, 89 (1st Cir. 2009). In fact, a sentencing court commits procedural error if it fails to acknowledge its discretion to vary from the guidelines sentencing range based on a categorical policy disagreement. Id.

The guidelines at issue here are those determining a defendant's base offense level according to the quantity and purity of methamphetamine involved. See U.S.S.G. § 2D1.1(c) (drug quantity table). Base offense levels for federal drug

crimes are calculated according to the Drug Quantity Table in the guidelines, which uses a graduated scale based on the type and quantity of drugs involved.  See id.  Methamphetamine is quantified based on purity.  See id.

The guidelines refer to three categories of methamphetamine according to relative purity: methamphetamine, methamphetamine (actual), and ice.  See U.S.S.G. § 2D1.1(c), Notes to Drug Quantity Table (B)-(C).  "Methamphetamine" refers to the gross weight of a mixture containing a detectable amount of methamphetamine (hereinafter referred to as "methamphetamine mixture").  See id. at Notes to Drug Quantity Table (A). "Methamphetamine (actual)" denotes the weight of actual methamphetamine contained in the mixture (hereinafter referred to as "actual methamphetamine").  See id. at (B).  "Ice" means the weight of a mixture of at least 80% purity.  Id. at (C). The guidelines direct the court to determine a defendant's base offense level using either the total weight of methamphetamine mixture or the weight of the actual methamphetamine contained within the mixture, whichever results in the greater base offense level.  See id. at (B).[1]  Actual methamphetamine and ice

_____

[1] Base offense levels for offenses involving PCP, amphetamine, oxycodone, and hydrocodone are also governed by purity.  See U.S.S.G. § 2D1.1, Notes to Drug Quantity Table (B). By contrast, the guidelines concerning drugs such as heroin, fentanyl, and cocaine, do not differentiate between the total

are treated identically under the guidelines, i.e., the same
weights of ice and actual methamphetamine result in the same
base offense levels. See, e.g., U.S.S.G. § 2D1.1(c)(3) (500
grams of actual methamphetamine and 500 grams of ice both
qualify for base offense level of 34).

The guidelines establish a 10:1 ratio in their treatment of
quantities of methamphetamine mixture and actual methamphetamine
or ice. For example, 5 kilograms of methamphetamine mixture, 500
grams of actual methamphetamine, and 500 grams of ice are all
treated the same way under the guidelines: all receive a base
offense level of 34.[2] See id.

The government argues, and the court agrees, that the 10:1
ratio at issue here is not a ratio based on different forms of
methamphetamine. Rather, the applicable statutes and guidelines
distinguish between different concentrations of methamphetamine
in a mixture. See United States v. Stoner, 927 F.2d 45, 47 (1st
Cir. 1991) (rejecting defendant's argument that statute

_____

weight of a mixture containing the drug and the weight of the
"actual" drug in the mixture. See U.S.S.G. § 2D1.1(c).

[2] The parties agree that Bean pleaded guilty to conspiring
to possess and distribute 50 grams or more of actual
methamphetamine, not ice. Nevertheless, the court's
disagreement with the 10:1 ratio applies equally to actual
methamphetamine and ice because they are treated the same under
the guidelines. For simplicity, however, throughout the
remainder of this opinion, the court refers only to actual
methamphetamine.

distinguished between "pure" methamphetamine and methamphetamine mixture as different forms of the drug). In this way, the ratio imposed by the methamphetamine guidelines is different from the 100:1 crack-cocaine ratio at issue in Kimbrough. While the guidelines distinguish between two forms of cocaine (cocaine and cocaine base/crack), they do not distinguish between different forms of methamphetamine. See U.S.S.G. § 2D1.1(c). Despite the differences between the guidelines governing methamphetamine and cocaine, the government concedes that—as applied—there is a 10:1 ratio between quantities of actual methamphetamine and methamphetamine mixture that result in the same base offense level. That 10:1 ratio is the focus of Bean's motion.

Bean argues that this court should categorically reject, on policy grounds, the 10:1 ratio between quantities of actual methamphetamine and methamphetamine mixture in the guidelines. A growing number of district courts have declared a categorical policy disagreement with the purity-driven methamphetamine guidelines. See United States v. Hoover, No. 4:17-CR-327-BLW, 2018 WL 5924500, at *4 (D. Idaho Nov. 13, 2018) (Winmill, J); United States v. Ferguson, No. CR 17-204 (JRT/BRT), 2018 WL 3682509, at *3-4 (D. Minn. Aug. 2, 2018); United States v. Saldana, No. 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790, at *7-10 (W.D. Mich. July 3, 2018); United States v. Harry, 313 F.

Supp. 3d 969, 974 (N.D. Iowa 2018) (Strand, J.); United States v. Nawanna, 321 F. Supp. 3d 943, 955 (N.D. Iowa 2018) (Bennett, J.); United States v. Ibarra-Sandoval, 265 F. Supp. 3d 1249, 1256 (D.N.M. 2017).[3] This court finds the collective reasoning employed in these decisions persuasive and joins them by declaring a categorical policy disagreement with the methamphetamine guidelines for the following reasons: (1) there appears to be no empirical basis for the Sentencing Commission's harsher treatment of offenses involving higher purity methamphetamine; (2) methamphetamine purity is no longer an accurate indicator of a defendant's role in a drug-trafficking conspiracy; and (3) the methamphetamine guidelines create unwarranted sentencing disparities between methamphetamine offenses and offenses involving other major drugs.

I.  Lack of Empirical Justification

The Supreme Court has acknowledged that the Sentencing Commission plays an important institutional role: "It has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with

_____

[3] See also United States v. Hayes, 948 F. Supp. 2d 1009, 1015 (N.D. Iowa 2013) (Bennett, J.); United States v. Hartle, No. 4:16-CV-00233-BLW, 2017 WL 2608221, at *4 (D. Idaho June 15, 2017) (Winmill, J.).

appropriate expertise." Kimbrough, 552 U.S at 109 (internal
quotation marks omitted).  In general, the Commission has used
its empirical and experiential approach to develop sentencing
guidelines that reflect a fair sentencing range.  See id. at 96,
109.  However, where the guidelines are not the result of the
Commission's exercise of its characteristic institutional role
(reliance on empirical studies and data), the guidelines are a
less reliable estimation of a fair sentence and are therefore
entitled to less deference.  See id. at 109-10 (holding that
district court could deviate from crack cocaine guidelines given
that those guidelines did not "exemplify the Commission's
exercise of its characteristic institutional role").

        The Commission did not exercise its institutional role and
rely upon empirical data to develop the guidelines for drug-
trafficking offenses.  Id. at 96.  Instead, it chose to "key the
Guidelines to the statutory mandatory minimum sentences that
Congress established for [drug offenses]."  Gall, 552 U.S. at 46
n.2; U.S.S.G. § 2D1.1, comment 8(A) ("The Commission has used
the sentences provided in and equivalences derived from, the
statute (21 U.S.C. § 841(b)(1)), as the primary basis for the
guidelines sentences."); see also Hayes, 948 F. Supp. 2d at
1023-25, 1027 (reviewing extensive history of methamphetamine
guidelines and concluding that they "were crafted by

Congressional directive and not precise analysis and empirical research").

The government does not dispute that, in establishing the methamphetamine guidelines, the Commission began with Congress's mandatory minimums and made no effort to use empirical data to deviate from Congress's judgment. Additionally, many courts have noted that no empirical data appears to justify the guidelines' 10:1 ratio. See, e.g., Harry, 313 F. Supp. 3d at 972-73; Saldana, 2018 U.S. Dist. LEXIS 110790, at *4; Hartle, 2017 WL 2608221, at *2. The Commission's departure from its characteristic institutional role and the dearth of empirical data justifying the 10:1 ratio support this court's policy disagreement with the purity-driven methamphetamine guidelines.

The government counters that the real issue is not whether the Commission fulfilled its traditional institutional role in formulating the guidelines, but whether Congress's mandatory minimum sentences are correct. The court disagrees. This court does not have discretion to deviate from the minimum mandatory sentences established in 21 U.S.C. § 841(b)(1). But it does have the authority to disagree with the guidelines promulgated by the Commission, especially where the guidelines at issue "do not exemplify the Commission's exercise of its characteristic institutional role." Kimbrough, 552 U.S. at 109.

II.  Purity as a Proxy for Culpability

The assumption underlying the guidelines' higher base offense levels for higher purity drugs is that purity "is probative of the defendant's role or position in the chain of distribution." U.S.S.G. § 2D1.1, comment 27(C).  In the commentary to the guidelines governing drug offenses, the Commission explained: "Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." Id.  This rationale provides the justification for the guidelines' consideration of purity in setting base offense levels for some drugs, like methamphetamine. See id.; see also Ibarra-Sandoval, 265 F. Supp. 3d at 1255 (acknowledging that comment 27(C) explains the rationale for purity-based methamphetamine guidelines); Nawanna, 321 F. Supp. 3d at 951 (same); Saldana, 2018 U.S. Dist. LEXIS 110790, at *5-6 (same). For other drugs, like heroin, where purity is not considered in setting the base offense level, this rationale justifies an upward departure based on purity. See U.S.S.G. § 2D1.1, comment 27(C).

The assumption underlying the methamphetamine guidelines—that purity indicates that a defendant is close to the source of drugs and therefore played a leadership role in the conspiracy—is divorced from current market reality. In its 2018 National Drug Threat Assessment, the Drug Enforcement Administration found that the average purity of methamphetamine between 2012 and 2017 was over 90%. Doc. no. 78-5 at 72. Indeed, the average purity of methamphetamine sampled in 2017 was even higher, at 96.9%. Id. The government does not dispute these statistics. In fact, counsel for the government noted anecdotally that his own experience would corroborate the fact that the average purity of New Hampshire methamphetamine is over 90%.[4]

Average methamphetamine purity has not always been this high. Between the 1980s and 2007, the average purity of methamphetamine fluctuated between approximately 30% and 80%. See doc. no. 78-3 at 16. Consequently, at one time, the guidelines' harsher treatment of higher purity methamphetamine was more grounded in fact. See Nawanna, 321 F. Supp. 3d at 951 (noting that there was once some truth to the assumption that high purity indicates greater culpability). Now, however, that

_____

[4] The court further notes that Bean cited and appended to his motion numerous studies, reports, and articles supporting his position. See doc. nos. 78-3, 78-4, 78-5, 78-6.

12

is no longer the case due to the consistently high average purity of methamphetamine.

In the current market, the purity of methamphetamine does not necessarily reflect a defendant's role in the distribution chain. Low-level street dealers are just as likely as so-called "kingpins" to have access to, and be charged with distribution of, extremely pure methamphetamine. In effect, then, the purity-based methamphetamine guidelines are treating all defendants as kingpins, even though that is not necessarily true. See, e.g., Saldana, 2018 U.S. Dist. LEXIS 110790, at *9 (explaining that guidelines "subject all defendants to harsh treatment, regardless of a particular defendant's role and regardless of any scoring enhancement already accounting for a defendant's role in the offense"); United States v. Ortega, No. 8:09CR400, 2010 WL 1994870, at *7 (D. Neb. May 17, 2010) ("The [10:1] ratio illogically skews sentences for 'average' defendants to the upper end of the sentencing spectrum, blurring the distinctions between high and low level distributors in a hierarchy.").

Indeed, the government agreed that, due to the high average purity of methamphetamine, essentially every methamphetamine case will be charged as involving actual methamphetamine rather than a methamphetamine mixture. This harsher treatment of

nearly all defendants based on one factor—purity—obscures other factors and creates "false uniformity." Cf. United States v. Cabrera, 567 F. Supp. 2d 271, 273 (D. Mass. 2008) ("False uniformity occurs when we treat equally individuals who are not remotely equal because we permit a single consideration, like drug quantity, to mask other important factors."). For these reasons, the court concludes that the purity of methamphetamine is no longer an accurate indicator of culpability. And, the court agrees with those courts that have expressed a policy disagreement with the purity-driven methamphetamine guidelines. See Nawanna, 321 F. Supp. 3d at 951-54; Saldana, 2018 U.S. Dist. LEXIS 110790, at *8; Ferguson, 2018 WL 3682509, at *4; Ibarra-Sandoval, 265 F. Supp. 3d at 1255; Hartle, 2017 WL 2608221, at *3-4.[5]

---

[5] Other courts have raised an additional and related criticism of the methamphetamine guidelines: they lead to unwarranted sentencing disparities between cases where the drug is lab tested for purity and those where it is not. See, e.g., Hartle, 2017 WL 2608221, at *3; Ferguson, 2018 WL 3682509, at *4. Those courts claim that this disparity arises from the fact that whether lab testing for purity is performed "in any case [is] completely arbitrary." Hartle, 2017 WL 2608221, at *3. This concern, however, does not appear relevant in this district at this time. The government represented that in this district lab tests for purity are performed in all federal methamphetamine cases.

III. <u>Unwarranted Sentencing Disparities</u>

Methamphetamine offenses receive more severe sentences than any other drug.  <u>See</u> <u>Nawanna</u>, <u>321 F. Supp. 3d at 953-54</u> (reviewing Sentencing Commission's 2017 statistics regarding methamphetamine sentences).  The average length of imprisonment for methamphetamine offenders in 2017 was 91 months, higher than for any other drug including heroin.  <u>Id.</u> at 953.  This disparity in sentencing between methamphetamine and other drug offenses arises from the fact that the guidelines provide higher base offense levels for actual methamphetamine than for other comparable drugs.  The guidelines' higher base offense levels for actual methamphetamine combined with the ubiquity of high purity methamphetamine in the market result in more severe sentences for methamphetamine offenders.

By way of illustration, 500 grams of actual methamphetamine earns a base offense level of 34, while the same quantities of other drugs result in lower base offense levels: fentanyl (30), cocaine base (crack) (30), heroin (26), and cocaine (24).  <u>See</u> U.S.S.G § 2D1.1(c).  By contrast, the base offense level for 500 grams of methamphetamine mixture is 30—a level more comparable to that advised for the same quantity of other major drugs.  <u>See</u> <u>id.</u>

These disparities in base offense levels result in corresponding disparities in guidelines sentence ranges. As a hypothetical, consider a defendant convicted of distributing 500 grams of a controlled substance. Assuming only a three-level decrease for acceptance of responsibility and a criminal history category of V, the following guidelines sentence ranges would result:

| Drug (500 grams) | Base Offense Level | Guidelines Sentence Range |
|---|---|---|
| Actual Methamphetamine | 34 | 168 to 210 months |
| Methamphetamine Mixture | 30 | 120 to 150 months |
| Cocaine Base (Crack) | 30 | 120 to 150 months |
| Fentanyl | 30 | 120 to 150 months |
| Heroin | 26 | 84 to 105 months |
| Cocaine (Powder) | 24 | 70 to 87 months |

The government agreed at the hearing that actual methamphetamine is penalized more severely by weight than any other major drug. At least one other court has noted that no empirical evidence supports this harsher treatment of actual methamphetamine as compared to other drugs. See Harry, 313 F. Supp. 3d at 973. The government provided no such evidence in

this case.  For all these reasons, this court finds that the guidelines' harsher treatment of actual methamphetamine as compared to other drugs is unsupported by empirical data and runs contrary to the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C § 3553(a)(6).

IV.   Procedure to Implement Categorical Policy Disagreement

For the reasons discussed above, the court disagrees as a matter of policy with the purity-driven 10:1 disparity between the calculation of base offense levels using the weight of actual methamphetamine versus the weight of methamphetamine mixture.  The court agrees with those courts that have expressed this disagreement by recalculating the base offense level in all methamphetamine cases using the methamphetamine mixture guidelines.  See Saldana, 2018 U.S. Dist. LEXIS 110790, at *11; Harry, 313 F. Supp. 3d at 974.[6]  Applying the methamphetamine mixture guidelines to determine the base offense level in all methamphetamine cases will bring base offense levels for methamphetamine offenses more in line with those of comparable

_____

[6] See also Nawanna, 321 F. Supp. 3d at 956 (applying policy disagreement with purity-driven methamphetamine guidelines by sentencing defendant consistent with methamphetamine mixture guidelines); Ferguson, 2018 WL 3682509, at *4 (same); Ibarra-Sandoval, 265 F. Supp. 3d at 1256-57 (same).

17

drug-trafficking offenses.[7]  This approach will also remove the

purity enhancement now present in all methamphetamine cases due

to the high average purity of methamphetamine.

A critical question remains: how best to implement this

policy disagreement?  While the Supreme Court has laid out a

two-step process for sentencing, see Gall, 552 U.S. at 49-50,

Millan-Isaac, 749 F.3d at 66, it has not yet made clear how a

sentencing judge should implement a categorical policy

disagreement with the guidelines.  By way of brief summary, the

two-step process is as follows: First, a sentencing court starts

by correctly calculating the guidelines sentencing range.  Gall,

552 U.S. at 49.  This first step provides the "initial

benchmark," id., or "anchor," Peugh v. United States, 569 U.S.

530, 549 (2013).  At the second step, a court must make an

individualized assessment, weighing the factors in 18 U.S.C. §

3553(a) against the prescribed guideline range to reach a fair

---

[7] As Judge Strand stated in Harry, this substitute ratio
"will hardly constitute a windfall to defendants in
methamphetamine cases."  Harry, 313 F. Supp. 3d at 974.  As he
points out, the methamphetamine mixture guideline ranges are
higher than the ranges for similar quantities of heroin and
cocaine and comparable to the ranges for similar quantities of
fentanyl and crack cocaine.  Id.; see also Saldana, 2018 U.S.
Dist. LEXIS 110790, at *7 (describing this substitute ratio as
yielding only "modest change" and rendering methamphetamine
sentences close to those for similar quantities of fentanyl and
crack).

sentence in each case. Gall, 552 U.S. at 49-50. The court's
central task is to impose a sentence that is "sufficient, but
not greater than necessary" to address all the goals of
sentencing. 18 U.S.C. § 3553(a). Once the judge decides on a
sentence, she must "adequately explain the chosen sentence to
allow for meaningful appellate review and to promote the
perception of fair sentencing." Gall, 552 U.S. at 50.

The Supreme Court's decision in Spears provides some
guidance on the question of how best to implement a policy-based
variance. In Spears, the Court upheld a sentencing judge's
categorical policy disagreement with the 100:1 ratio in a crack
cocaine case and use of a substitute ratio (20:1). Spears, 555
U.S. at 265-66. The Court explained that it is not "an
acceptable sentencing practice" to apply the substitute ratio
(20:1) as part of the sentencing judge's individualized
assessment made under § 3553(a). Id. at 266. Indeed, the Court
described such an approach as a judge "masking" her policy
disagreement as an individualized determination—which the Court
characterized as "institutionalized subterfuge." Id.

To accomplish the transparency required of the sentencing
process, the court should, therefore, avoid a procedure that
collapses its policy disagreement into its individualized

determination.  Adding a separate analytical step between step
one (the calculation of the guidelines range) and step two (the
individualized assessment under § 3553(a)) will address this
concern.  Specifically, after calculating the guidelines at step
one, the court will, at the next step, recalculate the
guidelines using the base offense level for the methamphetamine
mixture guidelines.  Maximum transparency is achieved if this
second step occurs before the individualized assessment at the
third and final step.

This new three-step process makes sense based on the nature
of the court's policy disagreement here.  The court disagrees
with the purity-driven ratio used to calculate a defendant's
base offense level in methamphetamine cases.  This disagreement
will exist in every case where the step-one calculation of the
base offense level is made using the actual methamphetamine
guidelines ratio (10:1).  The disagreement will take the form of
a policy-based variance that is wholly independent of the
individual defendant's unique circumstances and characteristics.
In short, every application of this policy disagreement would
result in a policy-based variance (as a result of the lower base
offense level).  And to promote transparency, the court should
impose that policy-based variance independently and separately

from its consideration of a defendant's individualized characteristics.[8]

Accordingly, the court will use the following sentencing methodology in all actual methamphetamine and ice cases: (1) calculate the guidelines sentencing range using the purity-driven methamphetamine guidelines; (2) recalculate the guidelines using the base offense level for the same quantity of methamphetamine mixture; and (3) evaluate whether any upward or downward variances are appropriate based upon the individual characteristics of the defendant and the other § 3553(a) factors. The court will apply this approach in all actual methamphetamine and ice cases regardless of whether the defendant requests the court to do so.[9]

Other district courts have adopted this same three-step approach. See Harry, 313 F. Supp. 3d at 974 (rejecting court's

_____

[8] Not all policy-based variances require analytical independence from the final step, application of the § 3553(a) factors. On the contrary, there are policy statements in Chapter 5 of the Guidelines that instruct courts about how to weigh a defendant's unique circumstances. See, e.g., U.S.S.G § 5H1.4 (drug and alcohol addiction not ordinarily a reason for downward departure). A court cannot evaluate such a policy statement without examining the individualized characteristics of a defendant's case. See Scott Michelman, Jay Rorty, Doing Kimbrough Justice: Implementing Policy Disagreements with the Federal Sentencing Guidelines, 45 Suffolk U. L. Rev. 1083, 1108-09, 1116-1120 (2012) (explaining same).

[9] To do otherwise would invite unwarranted sentencing disparities into this court's own docket.

21

own prior "ad hoc" approach to applying policy disagreement, and declaring that it would, in all actual methamphetamine and ice cases, engage in a separate analytical step to determine the guideline range based on methamphetamine mixture guidelines); Saldana, 2018 U.S. Dist. LEXIS 110790, at *11 ("This Court's methodology for sentencing in methamphetamine cases will be to treat all methamphetamine quantities as mixtures."); see also United States v. Gully, 619 F. Supp. 2d 633, 644-45 (N.D. Iowa 2009) (adopting three-step sentencing analysis to implement policy disagreement with crack-powder cocaine guidelines); Michelman, Doing Kimbrough Justice, supra at 1105 n.99 (collecting cases that implemented policy disagreement with guidelines by adding intermediate analytical step between the two steps identified in Gall).

The government urges the court not to apply a categorical policy disagreement in all methamphetamine cases for several reasons. First, it argues that it will engender intra-district disparities in sentencing in methamphetamine cases. However, the Supreme Court rejected the same argument in Kimbrough. See Kimbrough, 552 U.S. at 107-08. The Court observed that, although uniformity remains "an important goal of sentencing," some departures from uniformity are a "necessary cost" of the Court's ruling that the guidelines are merely advisory and its

recognition of district courts' discretion over sentencing.  Id.
It further noted that variations among district courts are
"constrained by the mandatory minimums Congress prescribed."
Id. at 108.

Second, the government contends that the court's
application of this policy disagreement in all methamphetamine
cases will make it more difficult for the government to
administer a coherent policy regarding sentencing departures
under U.S.S.G. § 5k and negatively impact a defendant's
incentive to accept responsibility and/or plead guilty.  Those
issues, however, are not for the court to resolve.  The court's
role is to impose a fair and just punishment in every case.

Finally, the government argues that defendant's motion is
premature and that the court should wait to decide whether to
vary from the guidelines based on a policy disagreement until
the time of sentencing.  The court disagrees.  As explained
above, the court's policy disagreement with the guidelines is
not dependent upon the unique facts and circumstances of each
case.  The government conceded that applying a policy
disagreement here will impact only the calculation of
defendant's base offense level, a process accomplished at the
front end of the guidelines calculation.  See Rosales-Mireles v.
United States, 138 S. Ct. 1897, 1904 (2018).  The government

23

further agreed that, based on the quantity of actual methamphetamine for which the defendant agreed to be held responsible, the practical effect of this policy disagreement would result in defendant's base offense level decreasing from 34 (actual methamphetamine guidelines) to 30 (methamphetamine mixture guidelines). In short, the court need not consult the presentence report to explain how it will implement its policy disagreement in this case.[10]

In sum, the court is not persuaded by the government's arguments. For the reasons outlined above, the court grants Bean's request to declare a policy disagreement with the methamphetamine guidelines.

**CONCLUSION**

For the foregoing reasons, Bean's motion (doc. no. 78) is granted.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

March 1, 2019
cc:   Counsel of Record
      U.S. Probation
      U.S. Marshal

---

[10] The United States Probation Office submitted Bean's presentence report on January 18, 2019, after the hearing on this motion. See doc. no. 88.